**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

| | |
|---|---|
| **DANIEL KNASICK,** | **Civ. Action No.:** |
| | 5:18-cv-091 (LEK/TWD) |
| **Plaintiff,** | |
| | |
| -against - | **COMPLAINT** |
| | |
| **COLGATE UNIVERSITY** | ***Jury Trial Demanded*** |
| | |
| **Defendant.** | |

-----------------------------------------------------------------------X

Plaintiff, DANIEL KNASICK (hereinafter referred to as "Plaintiff" or "Mr. Knasick"), by and through his attorneys, Nesenoff & Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, alleges upon knowledge with respect to himself, and upon knowledge, information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.      This is a civil action brought on behalf of Plaintiff against Defendant COLGATE UNIVERSITY (hereinafter referred to as "Defendant" or the "University") for retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law (the "SHRL"), together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendant.

4.     Venue is proper in this case pursuant to 28 U.S.C. § 1391 because a substantial part of the events which give rise to Plaintiff's claims took place in Madison County, New York which is in the Northern District of New York.

5.     All conditions precedent to filing the instant action have been fulfilled. On or about October 20, 2016, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") which was cross-filed with the New York State Division of Human Rights.

6.     On or about November 2, 2017, the EEOC issued Plaintiff a Notice of Right to Sue ("RTS").

7.     This action is being brought within 90 days of Plaintiff's receipt of his RTS.

## PARTIES

8.     Plaintiff is a male resident of the State of New York.

9.     At all times relevant to this Complaint, Plaintiff was an "employee" of the University as that term is defined by Title VII and the SHRL.

10.     Upon information and belief, Defendant is an institution of higher education located in Hamilton, New York with a principal place of business maintained at 13 Oak Drive, Hamilton, New York 13346.

11.     At all times relevant to this Complaint, Defendant was Plaintiff's "employer" as that term is defined by Title VII and the SHRL.

## FACTUAL ALLEGATIONS

### Mr. Knasick Commences Employment with Defendant
### As a Part-Time Campus Safety Officer

12.     In or around June of 2012, Mr. Knasick commenced employment with Defendant as a part-time Campus Safety Officer with the University's Campus Safety Department (the "Department").

13.     Thereafter, in or around April 2013, Mr. Knasick assumed a full-time position within the Department.

14.     Over the course of his tenure with Defendant, Mr. Knasick proved himself a loyal, dependable, and hard-working employee, and earned numerous personal commendations from faculty, visitors, students, and local law enforcement alike.

15.     As evidence of his hard work, Mr. Knasick was never subjected to any form of discipline prior to his untimely termination.

16.     Moreover, Mr. Knasick consistently stood up for what he believed in, and was an avid advocate for his colleagues and for the good of the University and its students, even when doing so meant going against those in power at the University.

### Plaintiff Witnesses Blatant Discrimination and Sexual Harassment at the University

17.     Throughout his tenure at the University, Mr. Knasick witnessed Defendant's managerial staff commit numerous violations of the University's policies, as well as blatant discrimination and harassment spearheaded by his own managers and colleagues.

18.     Mr. Knasick regularly observed ongoing racial tensions within the Department.

19.     By way of example, on a number of occasions, Mr. Knasick heard his Lieutenant, Mike Sitts ("Lt. Sitts"), and his fellow supervisors refer to an African American officer David

Gantt ("Officer Gantt"), as the Department's "golden child" meaning that Officer Gantt could do whatever he wanted "because he [wa]s Black."

20.     In addition, during an interaction with Lt. Sitts, Mr. Knasick commented that the University needed to hire more Campus Safety officers because Defendant was short-staffed.  In response, Lt. Sitts chastised Mr. Knasick for pointing out Defendant's understaffing problem and implored him not to make an issue out of it because the Defendant wanted to recruit more minorities and Lt. Sitts very openly did not want that to happen.

21.     Upon information and belief, Mr. Knasick's supervisors consistently called Officer Gantt "lazy" despite Officer Gantt's continued hard-work within the Department.

22.     Upon information and belief, Mr. Knasick's supervisors attributed Officer Gantt's "laziness" to his race. Indeed, whenever Mr. Knasick's supervisors made such comments they would point to their skin – as if to indicate Officer Gantt's skin color – and remark "what do you expect" from people like that – meaning Black individuals.

23.     As if the University's poorly veiled racial bigotry was not bad enough, the managers and employees in the Department also unabashedly sexually harassed, degraded, and targeted female officers in the workplace.

24.     Mr. Knasick was subjected to sickening sexual comments regarding his fellow female associates including being asked by a male officer, Daniel Tucker ("Officer Tucker"), if Mr. Knasick would like to have sex with a particular female employee.

25.     Specifically, Officer Tucker mocked the female dispatcher who was, by Officer Tucker's chauvinistic standards, not of an acceptable body type. Officer Tucker commented to Mr. Knasick that: "I've [Officer Tucker] done that, you need to try it" because "it's great

climbing in those sweaty folds." Officer Tucker repeated this comment, and similar remarks, numerous times.

26.     Mr. Knasick was positively repulsed by Officer Tucker's comments and utterly appalled that his managers found them entertaining and in fact, laughed at Officer Tucker's antics.

27.     The managers' reaction to Officer Tucker was unsurprising, however, as Mr. Knasick's colleagues often spoke at work in grotesque and graphic detail about their sexual escapades.

28.     Indeed, on several occasions, Mr. Knasick's co-worker shared stories of having had anal sex with his partner, describing the encounter in acute and repulsive detail while using degrading language to describe the woman with whom such encounter happened.

29.     Moreover, Mr. Knasick witnessed supervisors inappropriately touch their female subordinates at the University without permission and over the vehement objections of said women.

**Plaintiff Supports his Colleagues and**
**Stands Up Against Discrimination at the University**

30.     In an effort to correct these blatant wrongs, Mr. Knasick openly supported the employees victimized by Defendant's supervisory staff, and supported colleagues' complaints of discrimination to the University.

31.     Appallingly, instead of commending Mr. Knasick and addressing such complaints to the betterment of the University, Defendant used Mr. Knasick's actions as a springboard for blatant retaliation, and tormented Mr. Knasick for his lawful support of victims of discrimination

32.     In or around the Spring of 2015, Mr. Knasick became one of the University's targets when he openly supported two of his fellow employees after they individually filed complaints of workplace discrimination.

33.     Specifically, Officer Gantt confided in Mr. Knasick that he had personally experienced racial discrimination within the Department.  This came as no surprise to Mr. Knasick as he had often been witness to such discriminatory instances himself.  Mr. Knasick assured Officer Gantt that he would fully support him in any complaint Officer Gantt made, and further continued to alert Officer Gantt when he heard or witnessed any more racial discrimination in the Department.  Officer Gantt told Mr. Knasick that he intended to file a formal complaint with Defendant's Equity Grievance Panel (the "EG Panel"), and that Mr. Knasick would likely be contacted to give a statement.

34.     A few weeks later, Mr. Knasick was questioned by the EG Panel and asked to give a statement as to the Department's work environment and the various actions of his managers.

35.     Mr. Knasick truthfully answered all questions posed to him and informed the EG Panel that he had been witness to, among other things: (i) racial comments and slurs; (ii) violations of University policy and protocol by management personnel; (iii) had been subjected to a hostile work environment himself; and (iv) HIPAA violations.

36.     At such time, the EG Panel also questioned Mr. Knasick regarding potential gender discrimination within the Department.  Specifically, Mr. Knasick learned that his colleague Officer Schermerhorn ("Ms. Schermerhorn") had made a complaint of sexual harassment to the EG Panel.

37.     Once again, Mr. Knasick supported his victimized co-worker and vehemently opposed the chauvinistic and grotesque environment of gender bias and harassment which permeated the Department.

38.     Specifically, in support of Ms. Schermerhorn's complaint and in further opposition to the Department's discriminatory conduct, Mr. Knasick reported to the EG Panel that he had witnessed, among other things: (i) supervisors touching female subordinates inappropriately and without permission to do so; (ii) heard explicit and inappropriate conversations including depictions of graphic sex during the work day from his male supervisors and colleagues; (iii) heard strong and demeaning language used to describe women by his male supervisors and colleagues; (iv) had been subjected to inappropriate and sexual remarks regarding a fellow female employee which mocked such employee's weight and body shape; (v) HIPAA violations

39.     Mr. Knasick further noted that each time his colleagues engaged in such deplorable conduct, it was to the entertainment of management who openly laughed.

40.     Despite the ample examples Mr. Knasick provided to the EG Panel, upon information and belief, and much to the dismay of Mr. Knasick, Officer Gantt, and Ms. Schermerhorn, Lyn Rugg, the EG Panel chairperson did not follow through with the complaints and instead, referred the matters back to the Department. In doing so, Defendant gave Plaintiff's supervisors full access to his statements against them and their heinous conduct, leading to very negative results for Mr. Knasick.

**Defendant Retaliates Against Mr. Knasick**
**For Participating in the EG Panel's Investigation**

41.    Upon information and belief, the University and Mr. Knasick's managers knew that Mr. Knasick participated in the EG Panel's investigation in support of Officer Gantt's and Ms. Schermerhorn's complaints of discrimination and harassment.

42.    Thereafter, Mr. Knasick's supervisors and co-workers labelled him, in essence, a 'snitch' and subjected Mr. Knasick to a caustic work environment in pure retaliation for his participation in the EG Panel's investigation and opposition to the Department's discriminatory practices.

43.    Mr. Knasick was notified that two of his supervisors blamed Mr. Knasick for Officer Gantt's and Ms. Schermerhorn's complaints to the EG Panel.   Moreover, upon information and belief, Mr. Knasick's fellow officers were explicitly instructed not to trust Mr. Knasick and not to disclose any information against the Department if called upon by the EG Panel.

44.    Thereafter, Mr. Knasick noticed a marked difference in the way in which he was treated by his colleagues and supervisors.

45.    Specifically, in the Fall of 2015, Mr. Knasick found himself ostracized in the workplace.

46.    Moreover, for no discernible reason, Mr. Knasick was removed from his regular day shift and forced to work the nightshift to allegedly cover for a co-worker who was leaving. Notably, however, the University's coverage protocol dictated that open shifts were to be filed first by part-time employees, then overtime shifts, and then management.

47. Moreover, upon information and belief, there was no dire issue regarding staffing which necessitated Mr. Knasick's transfer and, upon information and belief, this was the one and only time the Unviersity had gone through such lengths to change an employees' shift.

48. Mr. Knasick contested the transfer to the nightshift through his union but to no avail. Indeed, despite winning such grievance, the University refused to accept defeat and continued to keep Mr. Knasick on the nightshift by using part-time and overtime employees to fill Mr. Knasick's regular day shift.

49. Mr. Knasick dutifully reported this retaliation to the EG Panel but was not re-instated to the day shift until in or around November 2015.

**Defendant Subjects Mr. Knasick to**
**Derogatory Comments and Harassment**

50. In addition to unilaterally changing Mr. Knasick's shift and ostracizing Mr. Knasick in the workplace, the University also subjected Mr. Knasick to verbal abuse and ridicule.

51. In response to his legitimate complaints and opposition to Defendant's discriminatory practices, Mr. Knasick was consistently called "Knasty" by University employees, a name which humiliated Mr. Knasick in front of his colleagues.

52. Appallingly, upon information and belief, Defendant's managerial staff witnessed such deplorable conduct and, instead of rectifying such behavior, repeatedly condoned these actions by laughing at Mr. Knasick along with his co-workers.

53. Mr. Knasick was consistently ridiculed by his managers for the simple act of doing his job. For example, pursuant to his pathogen training which he received over the course of his employment with the University, Mr. Knasick wore gloves when he responded to a call regarding an intoxicated individual eating and spitting dirt on campus. Following this incident,

Mr. Knasick's managers appallingly mocked Mr. Knasick and repeatedly asked him if he was "going to put gloves on for everything."

54.     As yet another example, Mr. Knasick kept a throw up bucket in his vehicle to use in the event he had to transport intoxicated students.  Mr. Knasick did so of his own volition to help maintain the cleanliness of the University's vehicles and to further help the students when they were ill and had to ride with him.  Once again, instead of commending Mr. Knasick's strict adherence to the job protocols and concerns for the students, his colleagues and managers humiliated Mr. Knasick with degrading comments. When Mr. Knasick reported such comments to his supervisor, he was rebuffed and made to feel "stupid" for bringing up the issue.

55.     Indeed, Mr. Knasick's supervisor had often found the comments amusing, and smirked at Mr. Knasick whenever he was called "Knasty."

**The University Terminates Mr. Knasick's Employment**
**To Further Silence His Opposition to Discrimination**

56.     On or about February 19, 2016, Mr. Knasick was abruptly informed by management that his employment had been suspended and instructed not to report to work the following day.

57.     Appallingly, such suspension was, upon information and belief, based upon a comment allegedly made by Mr. Knasick more than week prior.

58.     Shocked, Mr. Knasick did not return to work until on or about February 24, 2016 to attend a hearing before Defendant's Human Resources ("HR") Department.  At such time, Mr. Knasick learned that two officers had reported that Mr. Knasick said he was angry with the management team and that "if [he had been] in Vietnam with Director Ferguson (a war that happened over 50 years ago), [he] would have shot him in the back or thrown a grenade in his foxhole."

59.     Not only was this report blatantly false and borderline defamatory, it also came as a complete surprise to Mr. Knasick as he had had no warning of any report against him.  Mr. Knasick reported that he had no recollection of making such a comment and, even if it had been made (which Mr. Knasick does not concede it was), such comment was nothing more than an expression of Mr. Knasick's mounting frustration at the University's and the Department's repeated violations of its employees' civil rights which, upon information and belief, continue without repercussion.

60.     Defendant refused to allow Mr. Knasick to submit a statement in his defense, in complete disregard for Mr. Knasick's due process rights. Despite this, Defendant absurdly terminated Mr. Knasick's employment, effective immediately.

**CLAIMS FOR RELIEF**
**AS AND FOR THE FIRST CAUSE OF ACTION**
*(Retaliation in violation of Title VII of the Civil Rights Act of 1964)*

61.     Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

62.     As set forth herein and above, Plaintiff engaged in protected activity when he (i) objected to the rampant discrimination, including but not limited to racial discrimination, gender discrimination, and sexual harassment, spearheaded by Defendant's managerial and supervisory staff, and (ii) participated in an investigation into discrimination against the University.

63.     Thereafter, Defendant, unlawfully and without cause, retaliated against Plaintiff, which retaliation culminated in Plaintiff's termination.

64.     The retaliation substantially interfered with the terms and conditions of Plaintiff's employment.

65.     As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to: wages, social security, and other benefits due to him.

66.     As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

67.     Based on the foregoing, Defendant retaliated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964.

## AS AND FOR THE SECOND CAUSE OF ACTION
*(Retaliation in violation of the New York State Human Rights Law)*

68.     Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

69.     As set forth herein and above, Plaintiff engaged in protected activity when he (i) objected to the rampant discrimination, including but not limited to racial discrimination, gender discrimination, and sexual harassment, spearheaded by Defendant's managerial and supervisory staff, and (ii) participated in an investigation into discrimination against the University.

70.     Thereafter, Defendant, unlawfully and without cause, retaliated against Plaintiff, which retaliation culminated in Plaintiff's termination.

71.     The retaliation substantially interfered with the terms and conditions of Plaintiff's employment.

72.     As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to: wages, social security, and other benefits due to him.

73.     As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

65.     Based on the foregoing, Defendant retaliated against Plaintiff in violation of the New York State Human Rights Law.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff seeks a judgment against Defendant as follows:

(i)     A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned New York State and Federal laws;

(ii)     Preliminary and permanent injunctions against Defendant and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with Defendant, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

(iii)     An order restraining Defendant from any retaliation against Plaintiff for participation in any form in this litigation;

(iv)   All compensatory damages that Plaintiff has sustained as a result of the Defendant's unlawful discriminatory conduct, including back pay, front pay, damages to compensate Plaintiff for harm to his professional and personal reputation and loss of career fulfillment, emotional distress damages, general and special damages for lost compensation and employee benefits that he would have received but for the Defendant's conduct, and any other out-of-pocket losses that Plaintiff has incurred or will incur;

(v)   Punitive and/or exemplary damages against Defendant;

(vi)   Statutory pre- and post-judgment interest on all sums awarded;

(vii)   An award of costs and attorneys' fees; and

(viii)   Any other relief the Court finds just and proper.

**Dated: New York, New York**
**January 18, 2018**


**NESENOFF & MILTENBERG, LLP.**
*Attorneys for Plaintiff*

**By:**   /s/ Andrew Miltenberg

**Andrew T. Miltenberg, Esq.**
**Gabrielle M. Vinci, Esq.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**212.736.4500**